Hickman v. Westinghouse Electric Co.

5-1748                                        320 S. W. 2d 921

Opinion delivered February 23, 1959.

*Tom Gentry* and *John K. Shamburger,* for appellant.

*Riddick Riffel,* for appellee.

Sam Robinson, Associate Justice. This is a case arising under the Workmen's Compensation Law. The claim of the appellant, Mrs. Ruby L. Hickman, for compensation was disallowed and she has appealed. Mrs. Hickman went to work for the Westinghouse Electric Company in May, 1950. She worked at night, her hours being from 11:30 p. m. to 8:00 a. m. She says that while working in the due course of her employment one night in July, 1950, she hurt her back while lifting a bulky box weighing about 40 pounds. She further states that on the 12th day of December, 1951, while working on her job, she suffered a second injury to her back caused by an adjustable chair collapsing, the seat falling about six inches.

The overwhelming, in fact practically undisputed, evidence is that Mrs. Hickman has a 35% disability due to the condition of her back. Appellee concedes she is disabled to some extent, but contends that such disability was not sustained in the due course of her employment. There is substantial evidence that her condition

is due to the injuries she received while in the due course of her employment. But, notwithstanding the fact that there is substantial evidence to sustain an award had one been granted, the issue here is whether there is substantial evidence to sustain the Commission in not making an award of compensation. Very likely in a majority of cases there is substantial evidence to sustain the Commission in either granting or not granting an award. But in the case at bar we have reached the conclusion that there is no substantial evidence to sustain the Commission in denying Mrs. Hickman's claim for compensation. Since the case turns to the point of whether there is substantial evidence to sustain the Commission, it will be necessary to review the evidence in detail. At the time Mrs. Hickman went to work for Westinghouse in May, 1950, she was about 31 years of age and the mother of three children. With reference to the injury she claims to have received in July, 1950, she said: "I had a box on my knee to shove it up on this little platform, wooden platform, and I felt a catch and sharp pain in my back." She packed approximately two more boxes and took a severe headache, and asked Mr. Floyd Dooley to fix her a heat lamp for her back. Mr. Dooley, a machinist, was the only man on the job that night. One of his duties was to see that the girls kept busy. Mr. Dooley testified that Mrs. Hickman told him she had hurt her back and that he fixed her a heat lamp to give her some relief. Mrs. Hickman says she went to the lounge, where the light was applied, and Miss Betty Kirtley, a fellow employee, rubbed her back. Mrs. Hickman did not realize that she was seriously injured. She continued to work, and first went to see a doctor in January, 1951. However, it appears conclusive that subsequent to the night in July when she says she hurt her back, she constantly complained of the condition of her back, and one of the other women employees exchanged jobs with her so that Mrs. Hickman would not have to do any lifting. The first doctor she went to was a chiropractor, but she got no relief. In fact, her back was so tender that the chiropractor could not give her the usual kind of massage. Finally, in March, 1951, she went

to Dr. Vernon Newman, a well-known orthopedic surgeon. After applying many tests and observing Mrs. Hickman for a considerable time, Dr. Newman reached the conclusion that she had one or more ruptured discs in the lumbar region of her back. He therefore operated on her for that condition, but on exposing the spinal column it was found that the discs were not ruptured, but they were soft, and since they had been exposed, Dr. Newman felt it advisable to remove the fourth and fifth lumbar discs, which he did. After the effects of the operation had healed, Mrs. Hickman returned to work in September, 1951, and was doing nicely. She stated: "Well, I had gained a lot of strength and had asked the doctor was it necessary to wear a brace and he told me no, and I asked him did he think I was physically able to work and he told me yes, and I went back to work and I managed to work and not miss any time."

About eight or ten weeks after she returned to work, the chair collapsed with her. The fact that the chair did collapse is not controverted. Immediately following the collapse of the chair, she took a severe headache. Miss Morgan, the nurse at the place of employment, applied a heat lamp to her neck. This treatment lasted for about an hour and Mrs. Hickman returned to her work. And, although her condition grew gradually worse, she continued to work until the following April. The second injury had occurred in December, 1951. Following the second injury she returned to Dr. Newman for treatment, and he saw her during the Christmas holidays. The upper part of her back was hurting her. He gave her diathermic treatment, vitamin shots and suggested a spinal brace. Mrs. Hickman began using the brace and it was still necessary for her to wear one at the time of the hearing. She wears it all the time. It doesn't completely relieve the pain, but it helps some. However, she is not able to work.

Shortly after she was compelled to quit work in April, 1952, because of the condition of her back, she filed her claim with the Workmen's Compensation Commission. In support of the claim there is a letter in the record from Dr. Vernon Newman dated May 9, 1952.

Dr. Newman said that Mrs. Hickman came to him in March, 1951, and told him she was lifting some heavy boxes some time during July of 1950, that she complained of a low back pain, pain down the left leg and also some cramping in both legs, and that this was of six months' duration. Dr. Newman stated that Mrs. Hickman's greatest pain began in December following the collapse of the chair. Following this accident she was fitted with a corset, which appeared to give her some relief.

Dr. F. Walter Carruthers and Dr. Richard M. Logue, both well-known orthopedic surgeons, examined Mrs. Hickman on September 11, 1952, and continued to treat her thereafter, and on December 22, 1954, Dr. Carruthers reported that in his opinion she was 35% disabled due to the injuries she had received in July, 1950, and December, 1951.

To sum up the evidence from which a reasonable inference can be drawn that Mrs. Hickman is partially disabled due to injuries she received in the due course of her employment: She says she was injured in July, 1950, while lifting a bulky box weighing about 40 pounds. Of course, since she is a party to the case, her testimony does not have to be considered as undisputed. But, on the other hand, neither does it have to be disregarded. Mr. Floyd Dooley, apparently in charge of the women working at night at the defendant's plant, states that Mrs. Hickman told him she had hurt her back and asked him to prepare a heat light to be applied to her back. Miss Betty Kirtley states that after the heat lamp was applied, she massaged Mrs. Hickman's back and swapped jobs with her so that Mrs. Hickman would not have to do any heavy lifting. Other witnesses testified that Mrs. Hickman was constantly complaining with her back, but not one witness states that such complaints were ever made prior to the night in July when Mrs. Hickman says she hurt her back. According to the undisputed evidence she had returned to work and was doing nicely when the chair collapsed with her. This injury hurt her, and she reported it to Miss Morgan, the nurse at the place, and Miss Morgan

applied a heat lamp. It was necessary that Mrs. Hickman again go to see Dr. Newman, and in addition to other treatment he advised a brace in the form of a corset, which she has had to wear continuously thereafter to get some sense of relief from the pain. There is no indication at all of malingering. Immediately following her alleged injuries Mrs. Hickman made no claim for compensation. In fact, she continued to work, thinking that nothing serious was wrong and that it would clear up. Even after the second injury, she continued to try to work for several months before making a claim for compensation.

Now, from the standpoint of appellee, and in support of the proposition that there is substantial evidence to sustain a finding that Mrs. Hickman's disability is not due to injuries received in the due course of her employment, appellee relies on certain direct and circumstantial evidence. In the first place, appellee says: "No witness appeared in this case to testify that he saw any evidence of the injury to the claimant in July, 1950. On the contrary, two witnesses called by the appellant, who worked directly with her, denied any personal knowledge of any accidental injury." Appellant makes no claim that the nature of the injury she received and the manner in which she received it was such that there would be evidence of the injury that fellow workers would observe. In fact, she testified that she herself did not realize that she was seriously injured. Appellee quotes from the testimony of Wanda Deese: "Q. Mrs. Deese, did Mrs. Hickman ever tell you what caused her back to hurt her? A. No, she complained about her back all the time. I didn't pay any attention to it." It seems that this testimony corroborates Mrs. Hickman in her contention that she hurt her back. There is nothing to indicate that she would likely complain of her back if it didn't hurt; there is no indication that she was trying wrongfully to saddle any responsibility on her employer. Appellee argues that Mr. Floyd Dooley's testimony is of no value in establishing an inference that Mrs. Hickman was injured. Appellee quotes from Mr. Dooley's testimony: "A. Well, the only thing I do

know about it is while I was working on my machine Mrs. Hickman came up to my back—my back was to them —and told me she had hurt her back and I got up of course, and I said, 'Well, what shall we do about it?' She said 'Well, will you hook up a heat lamp? Maybe that will relieve some of the pain.' I said 'Sure, I'll hook up a heat lamp,' and I did so." We cannot see how Mr. Dooley's testimony can be said to amount to substantial evidence to prove that Mrs. Hickman received no injury. Actually, it has a tendency to prove just the contrary. When considered along with all the other evidence in the case, it indicates that she did receive an injury.

Appellee also argues that the fact that Mrs. Hickman made no report of the injury to her back to anyone except Mr. Dooley is circumstantial evidence of the fact that she received no injury. Such might be the effect of Mrs. Hickman's failure to report the injury to others if there was anything in the record whatever to indicate that she was trying to perpetrate a fraud or that she is malingering. But there is not one shred of evidence of that kind. In connection with her failure to make a further report of the July, 1950, injury, she stated that when she went to see Dr. Newman in March she realized that something was wrong with her back and that the injury she had received was the cause of it. She was asked: "Q. Why didn't you bring it to the attention of the company then? A. Because I had insurance I thought would help me pull through on that."

Now, as to the medical testimony produced by the appellee. Mrs. Hickman reported her injuries to the Workmen's Compensation Commission in the spring of 1952. Apparently the first hearing was held before Commissioner Peel in December, 1952. The appellee never had Mrs. Hickman examined by any doctor until April, 1953, when Dr. Rhinehart made some X-rays, and he reported at that time there was a straightening of the cervical portions of the spine, a slight wedging of the last thoracic and lumbar vertebrae and evidences of hypertrophic changes, but nothing suggesting a recent injury. The X-rays were made by Dr. Rhinehart

about three years after Mrs. Hickman received the first alleged injury and about a year and a half after she received the second alleged injury. There is no explanation of the term ''recent injury.'' It is not shown just what Dr. Rhinehart would consider a ''recent injury.'' Surely there must have been evidence that two intervertebral discs had been removed. In all probability Dr. Rhinehart would not consider evidence of an injury that occurred a year and a half previously, or three years previously, as ''recent.'' The next time appellee had Mrs. Hickman examined was by Dr. Samuel B. Thompson. He saw her one time, and that was on February 2, 1955, four and a half years after the first alleged injury occurred and three years after the occurrence of the second alleged injury. The report made by Dr. Thompson sheds absolutely no light whatever on whether Mrs. Hickman is disabled to any extent by reason of the first injury she is alleged to have received. Apparently Dr. Thompson merely examined Mrs. Hickman with the view of determining whether the second injury was the cause of her disability. He was asked, on direct examination: ''Q. Now, considering your physical examination in connection with the X-ray examination which you have seen by way of the films, state whether or not in your opinion the fall of the chair on which this lady was sitting was the likely cause of her, or any disability she has now. A. In my opinion it was not.'' It will be noticed that Dr. Thompson was referring only to the alleged 1951 injury, when the chair collapsed. His answer does not purport to apply to the July, 1950, injury.

Dr. Thompson further stated: ''I examined the films made on September 8, 1952 by Drs. Carruthers and Logue, consisting of anteroposterior and lateral views of the thoracic spine including films centered over the region of the 11th thoracic vertebra. I also had anteroposterior and lateral views of the thoracic spine and anteroposterior, lateral and oblique views of the cervical spine made by Dr. Barton Rhinehart, at this visit. These films show a mild compression deformity of the body of the 11th thoracic vertebra with narrow-

ing of the disc space between the 10th and 11th thoracic vertebrae and hypertrophic spurs on the 10th, 11th and 12th thoracic vertebrae. There is also a left scoliosis in the upper thoracic region . . . This patient has considerable pathology in her lower dorsal spine some pathology in her upper dorsal spine and some in her cervical spine as indicated by the X-ray appearance. I believe the X-ray findings are sufficient to explain the symptoms of which she complains and the objective findings noted on physical examination. The absent ankle jerk and the atrophy of the left thigh, of course, date back to the disc injury which she had had prior to this injury. Since, in my opinion, there are adequate findings to explain this patient's symptoms and to account for her disability, the chief question seems to be what relationship the injury incurred in December of 1951 (this was the time the chair collapsed) has to the present findings. From the history it is obvious that the ruptured disc in the lumbosacral region antedated the injury described since an operation had been performed for it prior to this injury."

In addition, Dr. Thompson testified: "I felt first the source of disability—she had had an operation for three ruptured discs she told me and we found certain findings indicating she did have some residual there. She had changes in the neck; had changes in the upper dorsal spine, lower dorsal spine, and changes in the lumbar spine. I was questioned about the effects of a specific injury and confined my report to that. I did not attempt to accumulate data to estimate her total disability. I felt the lumbar portion was a result of the condition she had been operated on for before the injury occurred (obviously he was speaking of the December 12, 1951, injury, when the chair collapsed). The reason I did not attempt to come up with a disability rating as a whole, the reason I felt this was not the result of the injury in December of '51, was first, the nature of the injury. The patient sat down on a chair that wasn't there or it collapsed and hit the floor." There is nothing whatever in Dr. Thompson's testimony to

indicate whether in his opinion Mrs. Hickman has a disability resulting from the alleged injury of July, 1950.

There is no issue in this case of whether proper notice of the injuries, as such, was given as provided by the Workmen's Compensation Law. Appellee frankly states: "The sole issue on this appeal is: Was there substantial evidence to support the finding of the Commission that the disability of appellant Mrs. Hickman was not the result of an accidental injury arising out of and in the course of her employment?"

There is no question about Mrs. Hickman's being partially disabled with the condition of her back. There is substantial evidence to support her claim that she has a disability due to injuries she received while working on her job, and there is no substantial evidence to the contrary. It might be pointed out that although, of course, the appellee has great facilities for getting information and for discovering competent and material evidence, there is not a scintilla of evidence in this record that Mrs. Hickman ever suffered any injury to her back or ever made any complaint of having back trouble until the instance on the night in July, 1950, when she was working on her job.

Although Dr. Carruthers testified that he thought 30% of the disability was due to the second injury and 5% to the first injury, and Dr. Thompson thinks that none of the disability is due to the second injury, the fact remains that there is substantial evidence that Mrs. Hickman is partially disabled from injuries received on the job. In the recent case of *Sparks Memorial Hosp. v. Walton*, 229 Ark. 1014, 320 S. W. 2d 102, we said: "In contending that the order is not supported by any substantial evidence the employer stresses the fact that the many physicians who have examined the claimant have not been able to arrive at a positive medical explanation for her condition. Despite an extensive exploratory operation and a succession of examinations and treatments the doctors have not discovered an objective cause for the severe pain that Mrs. Walton has suffered in her side, abdomen, back, and right leg. The physicians' un-

certainty does not, in our opinion, compel the conclusion that the claim must be denied."

The Commission based its finding that Mrs. Hickman is not entitled to compensation, on the theory that she did not prove she was injured in the course of her employment, and not on a finding that she is not partially disabled. Now that it is being held that appellant is entitled to compensation, the cause must go back to the Commission for that body to make a determination of the extent of the disability.

Reversed.